## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **SECOND AVE MUSEUM, LLC d/b/a** | ) | |
| **THE JOHNNY CASH MUSEUM,** | ) | |
| | ) | |
| **Plaintiff/Counter-defendant,** | ) | |
| | ) | **Case No. 3:20-cv-00067** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **RDN HERITAGE, LLC,** | ) | |
| | ) | |
| **Defendant/Counter-plaintiff.** | ) | |

## MEMORANDUM

Before the court are (1) the Motion for Partial Summary Judgment ("MPSJ") (Doc. No. 75) filed by defendant/counter-plaintiff RDN Heritage, LLC ("RDN" or "defendant") and (2) the Rule 41(a) Motion for Voluntary Dismissal (Doc. No. 100) filed by plaintiff/counter-defendant Second Ave Museum, LLC d/b/a The Johnny Cash Museum ("Second Ave" or "plaintiff").[1] For the reasons set forth herein, both motions will be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The facts as set forth herein are largely drawn from the defendant's Statement of Undisputed Material Facts ("SUF") (Doc. No. 69) and exhibits submitted by the defendant and are undisputed for purposes of the MPSJ, as demonstrated by the plaintiff's Response to the SUF (Doc. No. 115).

_____

[1] Also pending is RDN's Motion for Rule 11 Sanctions, which the court will address in a separate ruling. In addition, the plaintiff filed a Motion for Protective Order (Doc. No. 101), which has been held in abeyance pending further order of the court (_see_ Doc. No. 105).

A.    The 2012 Sponsorship Agreement

Second Ave, a Tennessee limited liability company with its principal place of business in Nashville, operates The Johnny Cash Museum ("Museum"), which is officially authorized by Johnny Cash's estate (the "Cash Estate"). Bill Miller, a Nashville businessman, is the managing member of Second Ave. (Compl., Doc. No. 1 ¶¶ 1, 6; Answer, Doc. No. 12 ¶¶ 1, 6.) RDN, a Wisconsin non-profit limited liability company, was formed by Robert Nueske, formerly the owner of Nueske's Meat Products, Inc. ("Nueske's Meats"), solely for the purpose of providing financing for Second Ave and the Museum. (Doc. No. 1 ¶¶ 1–2; Doc. No. 12 ¶¶ 1–2.) This dispute involves the contractual relationship between Second Ave and RDN related to the formation of, and financing for, the Museum.

In an email dated March 5, 2011, Bill Miller discussed with Nueske his long-time dream of opening a museum dedicated to honoring Johnny Cash and, for the first time, directly proposed that Nueske "sponsor" the venture. (Doc. No. 70-10.) Specifically, Miller proposed that Nueske "contribute $50,000 to build out and guarantee the lease" of a location in downtown Nashville that Miller had already identified as suitable and available, with rent estimated to be "about $6500 per month." (Doc. No. 70-10, at 6.) This contribution would make Nueske "the primary sponsor of the museum," and, as such, Nueske (or, presumably, his business, Nueske's Meats) would "receive all sponsorship benefits with signage, logo on all materials related to the museum, logo on all advertising as well as presence on the museum web site." (*Id.*) In addition, Miller envisioned that Nueske would receive "10% of the gross of all receipts from museum admission tickets and gift shop sales," which Miller anticipated could potentially "totally offset or even wipe out your sponsorship costs, or put you in a profit position." (*Id.*) Miller himself intended to "personally invest the balance required for the build out of the space as well as to capitalize the opening inventory for the gift shop." (*Id.*) In response to questions from Nueske, a subsequent email from

Miller laid out the projected costs of operation, markups on merchandise, and "very conservatively" estimated annual gross revenue of a minimum of $500,000 in admission ticket sales and an additional $600,000 in merchandise sales. (*Id.* at 2.) Miller indicated that the agent for the property would be in touch with him in a few days and that he was trying to put together a proposal for the property owner. (*Id.* at 6.) Despite the projected success of the venture, Miller had not been able to secure reasonable bank financing for the project.

Miller sent Nueske the first draft of the original Sponsorship Agreement on January 29, 2012. (Doc. No. 37-10.) In this draft of the Sponsorship Agreement, Second Ave and Nueske personally, as "Sponsor," are identified as the parties to the contract, and its terms largely mirrored those set forth in Miller's March 5, 2011 email. The draft also included a provision stating that "nothing in this Agreement shall be construed as creating a joint venture, partnership, franchise, agency, employer/employee, or similar relationship between the Parties." (Doc. No. 37-10, at 4.) In the email accompanying the draft, Miller requested that Nueske "review and execute" the document "at [his] earliest convenience." (*Id.* at 2.)

Even prior to Miller's sending the draft to Nueske, Miller and Nueske had apparently had a conversation about involving attorneys in the deal. In an email to Nueske dated January 18, 2012, Miller reiterated that he was not "crazy about attorneys," even though they are sometimes "necessary," in part because he had seen "lawyers kill deals." (Doc. No. 38-7.) "[I]nject[ing]" a lawyer "into the deal at this late hour" "seem[ed] and fe[lt] very onerous (and scary)" to him. (*Id.*)

Regardless, rather than signing the draft agreement sent to him by Miller, Nueske forwarded it to his attorney, Herbert Liebmann. Liebmann, upon receiving the draft agreement from Nueske, emailed Miller a revised draft. Liebmann summarized the revisions he proposed in an email to Miller accompanying the revised draft. Among other proposed changes, Liebmann

noted that the revisions included: (1) naming RDN, an entity to be formed by Nueske solely for the purpose of financing the Museum, as a party to the Agreement, rather than Nueske himself, and making Nueske's Meats, a separate entity, the express beneficiary of the sponsorship rights; (2) incorporating language to "protect [Nueske] from potentially being in a position where he had all of the down side risk without any upside benefit," such as, for example, if "things went swimmingly well and [Miller] were to buy the building and end the lease after a couple of years," in anticipation of which Liebmann "built in some standards for how long the Benefits to the Sponsor will run"; and (3) changing the revenue structure to a "stepped percentage of the gross revenues." (Doc. No. 38-14, at 3 (Feb. 7, 2012 email from Liebmann to Miller).) Absolutely nothing in the language of this email remotely suggests that Liebmann was operating as anything other than an advocate for Nueske alone.

Miller responded by email that he had "reviewed the sponsorship agreement, as amended, and will agree to the terms and conditions as proposed therein," with some "exceptions" and additional revisions upon which he insisted. (*Id.* at 2 (Feb. 7, 2012 email from Miller to Liebmann).) Regarding the "stepped percentage," he stated:

> Please take notice that Bob [Nueske] and I had previously agreed to a 10% of gross revenues as compensation to Bob. However, in light of my great affection for Bob and in recognition of my desire to see to it that he is adequately rewarded for the faith he had placed in us, I will agree to the 50% increase in the first $600,000 of gross annual revenue, as well as the 20% increase in the next $200,000 of revenue. [This is a] concession which should be recognized by everyone [as such].

(*Id.*) In addition, he proposed a revision of the language regarding his personal guarantee of the Agreement and demanded that certain language requiring RDN's approval of plans and cost estimates be stricken. (*Id.*) He did not object to the proposal to extend the term of the sponsorship. Moreover, Miller was clearly aware that the revisions proposed by Liebmann were less favorable to him (and more favorable to Nueske) than Miller's originally proposed terms. The language of

his response indicates that Miller understood that Liebmann was functioning as Nueske's attorney and not as an attorney for both him and Nueske in this transaction.

Miller and Nueske eventually finalized and signed the original Sponsorship Agreement, effective April 12, 2012 ("2012 Agreement"). (Doc. No. 70-1.) As Miller had originally proposed to Nueske, the 2012 Agreement required RDN to (1) provide the plaintiff with $50,000 toward the build-out of the Museum; and (2) make all rent payments on the Museum space for a period of five years, irrespective of the Museum's financial performance. Nueske personally agreed to guarantee RDN's performance under the 2012 Agreement. In return, regarding the "stepped percentages," rather than 10% of all gross revenues, as Miller had originally proposed, the finalized 2012 Agreement provided that RDN, during the first five years of the Agreement, would be entitled to 15% of the first $600,000 in annual gross revenue, 12% of the next $200,000 in annual gross revenue, and 10% of gross annual revenues in excess of $800,000. (Doc. No. 70-1, at 3 ¶ 2(F).) In addition, RDN would receive placement of Nueske's Meats branding on signage and brochures for at least five years. The 2012 Agreement had an initial five-year term but provided RDN with the option of extending it an additional five years.

On the same day, Second Ave and RDN jointly as "Tenant" entered into a lease (the "2012 Lease") with the owner of the building in which the Museum would be housed, Ritzen Properties II, LLC. (Doc. No. 12-3.) The 2012 Lease gave "Tenant, or either entity comprising Tenant, or a nominee owned by either entity comprising Tenant," an exclusive option to purchase the building" (*id.* at 25), and Nueske, individually, agreed to personally guarantee payments under the 2012 Lease (*id.* at 3). In addition, Nueske signed a Personal Guaranty guarantying RDN's performance under the 2012 Agreement, and Miller signed a Personal Guaranty, guarantying Second Ave's performance under the 2012 Agreement. (Doc. No. 12-2, at 6–7.)

**B.     The 2015 Amended and Restated Sponsorship Agreement**

The parties apparently operated under the 2012 Agreement for over two years without controversy. By 2014, the Museum was doing well financially, and Miller was considering buying the building in which the Museum was housed. On June 22, 2014, Miller sent Nueske an email in which he asked Nueske to "consider ending or altering the sponsorship agreement between the museum and RDN" and, more specifically, that they "end the royalty payments" and that Second Ave pay the rent going forward. (Doc. No. 70-11, at 2.) He explained:

> [P]lease don't take this wrong as I am and will be eternally grateful for what you did in helping get the lease on the building. Without you, it would have been difficult if not impossible. I know the intention was for you to be the safety valve in case things didn't go well and the operations couldn't cover the rent. You showed incredible faith in me by doing that.
>
> At this point, the museum is doing well. The sponsorship agreement with RDN is our single highest expense. The arrangement calls for the percentage to come off the top without any deducts for expenses and it's really impacting my ability to draw money for my efforts as well as in other areas of operations/expansion. The payouts have been at least twice as much as the royalty to the Cash Estate which is our other largest fixed expense. Big numbers.
>
> As you know, I am trying to buy the building so that I have control over my own destiny. Since I will be sole owner/occupant, there is no investment objective other than to stabilize costs and allow expansion into other spaces.
>
> The bank is concerned with all my royalty payouts and it could jeopardize my ability to get financing since there is essentially no cap.

(*Id.*) He added that the payments to RDN were "making the difference between profitability and having a very marginal bottom line." (*Id.*) Miller believed that RDN had "no deficit for what it has contributed toward the rent," but he assured Nueske that he would pay any such deficit and release both RDN and Nueske from any other financial obligations and that the Museum would continue to recognize Nueske's Meats as founding sponsor. (*See id.* ("As long as the museum stands, you'll be there.").)

Nueske responded on June 29, 2014 with a letter stating, in relevant part:

Bill, I certainly did not think your email was not heartfelt . . . I was just taken aback by your request that I just "walk away" from something that was now beginning to show good signs of success. And at the very beginning of a 5-year agreement no less . . .

I am willing to continue my responsible role, and will pay [rent] to the landlord, whether it be Ritzen Properties or you, . . . for the next several years, but I think it's only right that you would honor what you agreed upon at a time when there was no other way for you to get this project off the ground. . . .

You spoke of me being the "safety valve" had this not worked out, for whatever reason. Had it not, there would have been no safety valve for me. I would have been paying on a building that I had no use for to the tune of nearly $500,000 and that, my friend, was the risk I took. I did have faith in you, Bill, so that's why I did it. . . .

In closing, I am willing to continue the sponsorship under our agreement, including paying rent for the first five years, but you should not be asking me to walk away from the return on a very great risk just about the time I am approaching a break-even.

(Doc. No. 70-12.)

Miller (or an entity controlled by Miller) acquired the building in which the Museum was located in October 2014, with the 2012 Agreement still in effect. Attorney Kelly Frey represented Miller in the course of his purchase of the building.[2] In conjunction with Miller's purchase of the building, the parties, with RDN'a and Nueske's consent, terminated the 2012 Lease for the Museum premises and executed a new Lease, effective October 16, 2014. (*See* Doc. No. 70-4, at 2 (Amended and Restated Sponsorship Agreement referencing new Lease).)

Miller also retained Frey to represent him and Second Ave in attempting to renegotiate the terms of the 2012 Agreement with RDN, which began, but had not concluded, prior to closing on the building purchase. RDN and Nueske continued to be represented by Liebmann during these negotiations. In an email dated August 7, 2014 that appears, based on the subject line ("Background information we discussed"), to have been a continuation of previous conversations

---

[2] Miller had originally retained Frey in January 2013 to assist him in negotiating the terms of the Museum's licensing agreement with the Cash Estate.

on the same topic, Frey proposed certain amendments to the terms of the 2012 Agreement "based upon commercial reasonableness" that would be "consistent with the deals [Miller] has with arms-length third parties," specifically including a reduction of "the term of payments or percentage paid, especially in the second five year term." (Doc. No. 70-14, at 2.) He acknowledged that these would be "gratis concessions" by Nueske based on "change in circumstances." (*Id.*) Frey recognized that Nueske had no "affirmative obligation to reduce" the amount of the payments to RDN. (Frey Dep. 127, Doc. No. 70-8, at 12.)

Frey eventually suggested that the parties adopt "the same calculations for [RDN's] sponsorship payment" that Second Ave used for the "Cash Estate royalty payment," which he characterized as "an arm's length, industry standard negotiation/agreement that both sides think is fair." (Doc. No. 70-15 (Dec. 26, 2014 email from Frey to Liebmann).) Frey articulated a belief that this solution would be "simple, equitable," and would make both of their clients feel they were being "treated fairly." (*Id.*)

After approximately six months of negotiations, the parties finally agreed to terminate the 2012 Agreement and enter into the Amended and Restated Sponsorship Agreement ("2015 Agreement"), the effective date of which was January 1, 2015. (Doc. No. 70-4.) Pursuant to the 2015 Agreement, the parties expressly agreed that, in light of the termination of the 2012 Lease and other "changed circumstances," the payment obligations of both parties were "restated and replaced by those set forth" in the 2015 Agreement. (Doc. No. 70-4 ¶ 1.) It further provided that, once Second Ave had made all payments to RDN due under the 2012 Agreement, then "the provisions of the Original Agreement shall cease to be effective as between the Parties and the provisions of this New Agreement shall be substituted and govern the relationship between the parties." (*Id.* ¶ 8.)

The 2015 Agreement reduced the payments to which RDN was entitled to 8% of annual gross revenues and 10% of "Gross Profits" from the sale of merchandise and other items sold at the Museum and gift shop. (*Id.* ¶ 3.) It also gave RDN the right to examine, audit, and copy any accounts and records material to the calculation of its share of revenue. (*Id.* ¶ 3(d).) The 2015 Agreement retained Nueske's Meats sponsorship benefits, which included, among other benefits, the displaying of its logo in at least one "prominent location inside the Museum Premises and one prominent location inside the Museum Premises gift shop," the displaying of its logo on Museum literature and websites, and the mention of the company in the tag line at the "end of audio spots aired on the Johnny Cash Radio Network promoting the museum." (*Id.* ¶ 2.) In addition, RDN was entitled to a certain number of complimentary VIP passes to the Museum and access to the Museum premises for corporate events. The term of the 2015 Agreement is ten years from the effective date of the 2012 Agreement—that is, it terminates ten years from April 12, 2012. (*Id.* ¶ 4.) The 2015 Agreement, like the 2012 Agreement, provided that both parties agreed to hold its terms "in strictest confidence and not to disclose to any person" its terms and conditions, without the prior written consent of the other party. (*Id.* ¶ 5.) The 2015 Agreement terminated and released both Nueske and Miller from their Personal Guaranties. Finally, and critically, RDN agreed to release any rights it had under the 2012 Lease to purchase the building housing the Museum, and Second Ave agreed to "release and hold [RDN] harmless from any claims against [RDN] under the Original Lease or with respect to operations of the Museum through the Termination Date." (*Id.* ¶ 7.) There is no dispute that Second Ave paid all sums due to RDN under the 2012 Agreement and that the 2012 Agreement terminated and the 2015 Agreement went into effect on January 1, 2015.

When questioned during his deposition about his representation of Miller and Second Ave, Frey stated that, because these transactions happened years ago, he did not recall numerous aspects of his representation of Miller and Second Ave. However, he testified that he was generally a "zealous" advocate for the Museum during his negotiations with Liebmann regarding the new agreement and that, in his own estimation, he was "always aggressive in representing [his] clients." (Frey Dep. 242, Doc. No. 70-9, at 9.) At no time did Frey express an opinion or belief to Liebmann that the 2012 Agreement was unconscionable or invalid. (*Id.* at 221, Doc. No. 70-9, at 8.) Likewise, Frey did not recall ever telling Liebmann that he believed that Liebmann had "jointly represented both parties to the 2012 Sponsorship Agreement." (*Id.* at 60, Doc. No. 70-8, at 7.)[3] He also stated that he did not think he would "ever suggest to a client that they sign an agreement that was unconscionable." (*Id.* at 72, Doc. No. 70-8, at 8.) Miller, for his part, never told Nueske or Liebmann that he believed the 2012 Agreement was unconscionable, prior to his filing of the Complaint that initiated this lawsuit.

Robert Nueske died suddenly in early January 2015, shortly after the parties had agreed to the final terms of the 2015 Agreement.

## C.    The Lawsuit

The parties apparently operated under the 2015 Agreement without conflict for four and one-half years, through the first half of 2019. However, Second Ave admits that: (1) it has failed to provide the sponsorship benefits due under the 2015 Agreement from the Fall of 2019 to the present; (2) it has failed to make payments due RDN under the 2015 Agreement, including (but

---

[3] He testified that, if he had been working on an amendment to the 2012 Agreement and learned that an attorney had represented both parties in forming the agreement, he "might have" raised concerns about such joint representation to the attorney during negotiations of an amendment to that agreement. (Frey Dep. 60, Doc. No. 70-8, at 7.)

not limited to) payments in the amount of $198,900.58 for the fourth quarter of 2019, and $120,568.99 for the first quarter of 2020.

In January 2020, Second Ave initiated this lawsuit against RDN, alleging in its Complaint that Liebmann had "represented both [RDN] and [Second Ave]" in the formation of the 2012 Agreement, "which constituted a conflict of interest (as to which Second Avenue Museum was not informed and to which it did not consent) and a breach of [Liebmann's] fiduciary duty." (Doc. No. 1, at 1.) Second Ave claims that, because it had "no meaningful or independent legal representation in the transaction" and "no meaningful bargaining power," RDN was "afforded extraordinary and overwhelmingly unequal bargaining power and wrongful advantage in the transaction." (*Id.* at 1–2.) It alleges that, as a result, "the financial terms of the Original Agreement are so unfair and one-sided" as to render the 2012 Agreement unconscionable. (*Id.* at 2.) It further alleges that, because the 2015 Agreement derives from the 2012 Agreement, Second Ave remained "without bargaining power to renegotiate the unconscionable terms of the Original Agreement in any meaningful way," as a result of which the 2015 Agreement, too, is "unconscionable." (*Id.*) The Complaint also recites that the Patsy Cline Museum opened in 2017 on the second floor of the same building occupied by the Johnny Cash Museum and that, in 2019, RDN asserted that it was entitled to a share of the revenue from the Patsy Cline Museum as well. (*Id.* at 10 ¶ 43.)

The Complaint seeks (1) a judicial declaration under 28 U.S.C. § 2201 that both the 2012 Agreement and the 2015 Agreement are unconscionable and unenforceable (*id.* at 11 ("Count I")); (2) a declaration that RDN is not entitled to revenue from the Patsy Cline Museum (*id.* at 12 ("Count II")); (3) "rescission and/or reformation" of "both the Original Agreement and the Amended Agreement" in order to "place the parties [in] the position they occupied before the execution of the Original Agreement, including the repayment to Second Ave Museum of all

amounts that are unreasonable and excessive paid to [RDN] since April 2012, less the actual amount of rent payments made by [RDN], if any." (*id.* ("Count III")).

RDN answered the Complaint, denying that Second Ave is entitled to the relief sought, and it also lodged counterclaims. (Doc. No. 12.) Four of the counterclaims are for breach of contract, specifically (1) breach of the payment provisions of the 2015 Agreement, based on the plaintiff's failure to make the payments due for the preceding two quarters; (2) "prospective breach of contract," asserting that Second Ave had filed suit "in bad faith attempt to avoid future payments" to RDN and seeking a "judgment requiring the Museum's compliance" with the 2015 Agreement's "profit sharing terms" (Doc. No. 12, at 21); (3) breach of the sponsorship provisions contained in the 2015 Agreement, based on Museum's failure to display the Nueske's Meats logo and name at the Museum, in Museum literature, or on the website and failure to mention it in the tag line at the end of audio spots promoting the Museum on the Johnny Cash Radio Network; and (4) breach of the non-disclosure provision of the 2015 Agreement, based on the filing of the unsealed Complaint discussing the terms of the contract along with an unsealed copy of the contract as an exhibit.[4] In Count V of the Counterclaims, RDN also seeks a declaration that it is entitled to an accounting under the terms of the 2015 Agreement.

In November 2020, the plaintiff filed a Motion to Compel Discovery (Doc. No. 37), in which it sought to compel the defendant's production of communications between Nueske and Liebmann related to the 2012 Agreement and the 2012 Lease. RDN had identified these documents as existing but protected from disclosure by the attorney-client privilege. Alternatively, Second

---

[4] The court notes that the defendant has never sought to seal either the Complaint or the exhibits filed with it, nor did it seal its Answer, to which it also appended unsealed copies of the 2012 and 2015 Agreements, as well as copies of the 2012 Lease Agreement and the 2013 Amended and Restated License Agreement between Second Ave and the Cash Estate. (Doc. Nos. 12 and 12-1 through 12-4.)

Ave requested that the court review these documents *in camera*. The plaintiff argued that, although the documents constitute attorney-client communications, they are not privileged as to Second Ave (or Miller), because they relate to matters with respect to which Liebmann jointly represented the parties. (Doc. No. 38, *passim*.) In a reply brief filed in support of its motion, the plaintiff modified its request to ask that the court defer ruling on the production of documents related to the 2012 Agreement "until after the depositions of Miller and Liebmann." (Doc. No. 57, at 5.)

The court referred this motion to Magistrate Judge Frensley, who denied it. (Doc. No. 71.) Magistrate Judge Frensley found, as relevant here, that: (1) the party asserting attorney-client privilege has the burden of establishing that the privilege applies (Doc. No. 71, at 9 (citing Fed. R. Civ. P. 26(b)(5); *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983)); (2) Second Ave failed to present any legal support for its assertion that "the existence of a joint representation destroys the ability of one client to assert the attorney-client privilege as to the other over communications solely between the attorney and the client asserting the privilege," as a result of which it was "not clear that Second Ave would be entitled to otherwise-protected communications between Mr. Nueske and his attorneys," even assuming that Second Ave could establish that Liebmann had jointly represented the parties with respect to the 2012 Agreement (*id.* at 10); (3) Second Ave had not presented "any evidence that Mr. Miller formed an attorney-client relationship with Mr. Liebmann related to the Original Agreement," apart from Miller's own Declaration, which was "based in large part on his recollection of conversations with the now-deceased Mr. Nueske," but other evidence in the record constituted "persuasive evidence that Mr. Liebmann and Mr. Miller did not have any attorney-client relationship" in connection with the formation of the 2012 Agreement (*id.* at 10–12); and (4) in light of the absence of any evidence of its entitlement to the documents, Second Ave failed to establish that *in camera* review of the

privileged documents was warranted. Second Ave never sought this court's review of the Magistrate Judge's denial of its motion or the conclusion that it had failed to establish, for purposes of that motion, that Second Ave had ever formed an attorney-client relationship with Liebmann.

Nearly contemporaneously with the Order denying the plaintiff's Motion to Compel, RDN filed its Motion for Partial Summary Judgment (Doc. No. 75), supporting Memorandum of Law (Doc. No. 76), Statement of Undisputed Material Facts (Doc. No. 69), and numerous exhibits. The plaintiff has now filed a Response to the MPSJ (Doc. No. 114) and a Response to the Statement of Undisputed Material Facts (Doc. No. 115), and the defendant has filed a Reply (Doc. No. 125).

Several months after the defendant filed the MPSJ but before the plaintiff responded to it, Second Ave filed its Motion for Voluntary Dismissal. (Doc. No. 100.) This motion, like virtually every other motion filed in this case, has been intensively briefed, with the parties having filed a Response (Doc. No. 108), Reply (Doc. No. 113), and Surreply (Doc. No. 121).

## II. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d

718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

### B.      Discussion

RDN moves for summary judgment in its favor on both the plaintiff's claims and its own counterclaims, leaving for later resolution only the matter of damages. The court addresses the disposition of the counterclaims first.

#### 1.      The Counterclaims

RDN has lodged four counterclaims for breach of contract and one for a declaration that it is entitled to an "accounting" under the 2015 Agreement. The essential elements of a breach of contract claim under Tennessee law include "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (citations omitted). The defendant here posits that there is no dispute as to the first and second elements and that it is entitled to partial summary judgment in its favor on each of its counterclaims for breach of contract. In particular, RDN contends that the 2015 Agreement is valid and

enforceable as a matter of law (Doc. No. 76, at 27–34), that there is no dispute as to Second Ave's breach of material provisions thereof, and that the only issues to be determined in the case are related to the damages arising from the various breaches.

a) *Count I*

Count I of the defendant's Counterclaims is for breach of the payment provisions of the 2015 Agreement. (Doc. No. 12, Counterclaims ¶¶ 52–57.) Second Ave concedes that it "has made no payments to RDN since the second quarter of 2019" and agrees that the "only issue remaining for trial is the amount of RDN's alleged damages." (Doc. No. 114, at 13, 1.) However, it opposes summary judgment on this claim on the basis that it is "preparing," upon the court's anticipated grant of its Motion for Voluntary Dismissal, "to begin paying royalties to RDN under the Amended Agreement, as written," which, it claims, will "moot" this claim, as well as several of the other claims. (*Id.* at 1.)

The plaintiff appears to be misinformed as to what the term "moot" means. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767 (6th Cir. 2019) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). On the other hand, "[v]oluntary cessation of the alleged illegal conduct does not, as a general rule, moot a case and 'deprive the tribunal of power to hear and determine the case.'" *Id.* (quoting *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979)). "Voluntary cessation will only moot a case where there is 'no reasonable expectation that the alleged violation will recur,' and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* (quoting *Davis*, 440 U.S. at 631). "The burden of demonstrating mootness is a heavy one." *Id.*

The plaintiff here has not even shown a voluntary cessation of the allegedly illegal conduct. Instead, it has merely conceded liability and expressed an *intention* to voluntarily cease, at some

indeterminate point in the future, withholding the payments it is contractually obligated to make. This intent clearly does not render the defendant's claims moot.

Moreover, in the face of the undisputed facts set forth by RDN and its persuasive and comprehensive argument in support of its position that the 2015 Agreement is neither procedurally nor substantively unconscionable, Second Ave does not interpose a defense to the enforcement of the 2015 Agreement based on unconscionability or otherwise. Instead, it states, without argument and without actually pointing to any evidence, that it "maintains its belief that the unfairness of the Amended Agreement would render it unenforceable." (Doc. No. 114, at 13.) But, under Tennessee law, courts "will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise." *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003) (citation omitted). Thus, the mere fact that a contract is arguably "unfair" does not necessarily make it unenforceable. Rather, under Tennessee law, a contract is unenforceable only if it is "unconscionable," and it is unconscionable, generally, only if "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other." *Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001), *abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016). Under Tennessee law, "[t]he question of whether a contract or provision thereof is unconscionable is a question of law," *Taylor v. Butler*, 142 S.W.3d 277, 284–85 (Tenn. 2004), and "a presumption of permissible dealings exists between commercial parties." *Fifth Third Leasing Co. v. Cherokee Pontiac, Buick, Olds, GMC Trucks, LLC*, No. E2001-01628-COA-R3CV, 2002 WL 407224, at *2 (Tenn. Ct. App. Mar. 13, 2002).

The plaintiff here presents *no* evidence or argument in support of its affirmative defense

(or actual claim) that the 2015 Agreement is unconscionable.[5] The court finds, as a matter of law based on the undisputed facts, that the Agreement was not procedurally or substantively unconscionable. The parties were both represented by counsel, and Second Ave's counsel himself conceded that the terms of the 2015 Agreement were commercially reasonable. There is no evidence of unequal bargaining power or of contract terms so unequal or oppressive as to shock the conscience.

Finally, Second Ave does not deny having breached the payment provisions of the 2015 Agreement. The court finds, as a result, that the defendant is entitled to summary judgment in its favor on Count I of the Counterclaims, for breach of the payment provisions of the 2015 Agreement, with the issue of the quantification of damages remaining to be resolved.

> b)      *Count II*

Regarding RDN's claim for "Prospective Breach of Contract for Payments," the court notes that (1) it is undisputed, at this point, that RDN continued to incur damages after the filing of the Complaint and Counterclaim, since, as indicated above, the plaintiff concedes that it has not made any payments since the second quarter of 2019; and (2) Count II of the Counterclaims, while asserting "prospective breach," actually appears to be seeking a declaration that the 2015

---

[5] The factual summary the plaintiff incorporated in its Response in Opposition to the MPSJ includes a lengthy recitation of what amounts to an alternative version of the facts, which it did not include in a separate statement of material facts as to which it contends there is a material factual dispute. In this section, the plaintiff continues to argue that he "reasonably" believed, "based on Liebmann's conduct and statements, as well as reassurances from Nueske, that Liebmann was acting in the interests of both parties" in connection with the negotiations and execution of the 2012 Agreement. (Doc. No. 114, at 3.) This issue has been resolved: the plaintiff has no evidence beyond his subjective belief that Liebmann represented him and Nueske both in the formation of the 2012 Agreement, and that is not sufficient to establish that an attorney-client relationship was formed. Moreover, the question of whether Miller reasonably believed that Liebmann was representing both parties in the initial transaction is not synonymous with the question of whether the 2012 Agreement was unconscionable and has nothing at all to do with whether the 2015 Agreement was unconscionable.

Agreement is enforceable going forward. (*See* Doc. No. 12, Counterclaim ¶ 62 ("RDN Heritage is entitled to a judgment requiring the Museum's compliance with the [2015] Agreement's profit sharing terms.").)[6] The plaintiff opposes this portion of the motion, again, on the basis that it is "moot" in light of the plaintiff's expressed intention to begin making payments on the contract after the court grants its Motion for Voluntary Dismissal. (Doc. No. 114, at 13.) And, again, Second Ave interposes no affirmative defense or, indeed, any defense, to the defendant's assertion that the 2015 Agreement is valid and enforceable and that the plaintiff has failed to make payments as required by the Agreement since the filing of the Answer and Counterclaims.

The claim is not moot, for the reasons set forth above. As a result, the court finds that the defendant is entitled to summary judgment in its favor as to Count II of the Counterclaims, in the form of a declaration that the payment provisions of the 2015 Agreement are valid and enforceable.

### c)    Count III

Count III of the Counterclaims is for breach of the sponsorship provisions of the 2015 Agreement. (*See* Doc. No. 12 ¶¶ 67–71.) The plaintiff argues that the defendant has not established as a factual matter that the plaintiff has breached each of the sponsorship provisions enumerated in the 2015 Agreement, as the defendant's Statement of Undisputed Facts references (and the plaintiff admits to) the violation of only one of these. (*See* Doc. No. 115 ¶ 55 (in which the plaintiff concedes that it "failed to provide the sponsorship benefits due under the [2015] Agreement: specifically, it has failed to display the Nueske's . . . Meats logo in the Museum from Fall of 2019

---

[6] Insofar as this paragraph could be construed as seeking a permanent injunction, the court declines to issue one. RDN has made no attempt to establish the elements necessary to secure such relief, including that (1) it has suffered an irreparable injury; (2) monetary damages are inadequate to compensate for its injury; (3) an equitable remedy is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citations omitted).

to present.").) The plaintiff contends that the defendant has not established as a factual matter, for purposes of its motion for summary judgment, violation of the other sponsorship provisions, as RDN references these only in its Memorandum in support of its MPSJ and supports the references with citations to paragraphs 68 and 70 of the plaintiff's Reply in support of the plaintiff's Motion to Compel. (*See* Doc. No. 76, at 38 (citing "Reply, ¶ 68" and "Reply, ¶ 70").)

The court observes that the plaintiff's Reply in support of its Motion to Compel (Doc. No. 57) does not contain paragraph numbers, and the court declines to comb the record to locate the language the defendant attempts to rely upon. The court agrees with the plaintiff that the defendant has failed to establish, as a factual matter, other violations of the sponsorship provisions of the 2015 Agreement beyond the plaintiff's admitted failure to post the Nueske's Meats logo inside the Museum beginning in 2019. *Accord* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727.1 (4th ed.) ("If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response."). However, there is no dispute that the plaintiff breached the requirement that it post the Nueske's Meats logo inside the Museum.

While the plaintiff concedes, in part, a violation of the sponsorship provisions of the 2015 Agreement, it nonetheless contends that the defendant is not entitled to summary judgment on this claim because it has failed to allege the *existence* of damages arising from this breach, apart from their quantification. The court is not persuaded. The defendant here has clearly moved for partial summary judgment on the issue of Second Ave's breach of its obligations under the 2015 Agreement, while reserving for trial the issue of damages. There is no question that, under Tennessee law, proof of damages is a required element of any breach of contract claim. *See, e.g.*, *ARC LifeMed.*, 183 S.W.3d at 26 (identifying "damages caused by the breach of the contract" as

an essential element of any claim for breach of contract). However, the damages element is a single element; in enumerating the "elements" of a breach of contract cause of action, Tennessee courts do not distinguish between the *existence* of damages and the *amount* of damages. Without proof of damages and some way of quantifying them, a claimant will not be entitled to recover damages for an alleged breach of contract. *See Kindred v. Nat'l Coll. of Bus. & Tech., Inc.*, No. W2014-00413-COA-R3CV, 2015 WL 1296076, at *6 (Tenn. Ct. App. Mar. 19, 2015) ("The party seeking damages has the burden of proving them. Without proof of damages, there can be no award of damages." (internal quotation marks and citations omitted)). While damages do not need to be proven with "mathematical certainty," a party is "not entitled to recover uncertain, contingent, or speculative damages." *Id.* (citations omitted). "[D]amages will be considered uncertain or speculative when their *existence* is uncertain, or when the proof is insufficient to enable a trier of fact to make a fair and reasonable assessment of damages." *Id.* (citations omitted).[7]

In other words, the element of damages incorporates both the existence and quantification of damages. In light of the posture of its motion, the defendant was not required to put forward proof of either the existence or amount of its damages. It will bear the burden of doing both at a trial on damages.

The defendant is entitled to summary judgment as to liability on Count III *in part*, insofar as the evidence before the court establishes only that the plaintiff failed to post the Nueske's Meats logo inside the Museum. RDN has not established entitlement to summary judgment based on alleged violations of other provisions of the sponsorship provisions of the 2015 Agreement. To recover on these claims, RDN will be required to offer evidence of breach as well as evidence of

---

[7] The court takes judicial notice, as a matter of common sense, that advertising—in the form of displaying a business's logo—has monetary value, and the failure to provide promised sponsorship benefits in the form of advertising likely caused quantifiable monetary damages.

damages at the eventual trial.

> d)      Count IV

Count IV of the Counterclaims asserts that the plaintiff breached the non-disclosure provision of the 2015 Agreement, pursuant to which both parties agreed to "hold in strictest confidence and not to disclose to any person . . . without prior written consent of the other [party] any of the terms and conditions of this agreement." (Doc. No. 1-2 ¶ 5.) RDN alleges that the plaintiff breached this provision by filing the Complaint (along with an unredacted copy of the 2015 Agreement). (Counterclaim ¶¶ 75–76.) The plaintiff offers no argument to refute or address RDN's contention that the public filing of this lawsuit may give rise to liability for breach of a contractual confidentiality provision. Other courts confronted with this issue have concluded that the filing of a lawsuit may breach a non-disclosure agreement and is not protected by the litigation privilege. *See, e.g.*, *Full Circle United, LLC v. Skee-Ball, Inc.*, No. 11 CV 5476 (LB), 2014 WL 12829195, at *7 (E.D.N.Y. May 13, 2014) ("FC alleges that SBI breached the 2010 Confidentiality Agreement by . . . filing the instant lawsuit . . . . As an initial matter, the Court rejects SBI's argument that its lawsuit is protected by New York's litigation privilege. The cases SBI cites are inapposite as they involve claims for defamation based on statements made in a lawsuit, not claims for breach of contract based on the filing of a lawsuit."); *accord Rapaport v. Strategic Fin. Sols., LLC*, 140 N.Y.S.3d 508, 510 (App. Div. 2021); *Crossroads Invs., L.P. v. Fed. Nat'l Mortg. Ass'n*, 222 Cal. Rptr. 3d 1, 28 (Cal. Ct. App. 2017) ("Generally, the litigation privilege precludes liability in tort, not liability for breach of contract."); *see also Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 702 (Tenn. 2002) ("[T]he defense of judicial privilege is available to actions of defamation."), *quoted in New Hampshire Ins. Co. v. Blackjack Cove, LLC*, No. 3:10-CV-607, 2014 WL 1270984, at *14 (M.D. Tenn. Mar. 26, 2014) (Sharp, J.) (declining to extend the litigation privilege beyond the context of defamation claims).

Thus, the defendant is entitled to a judgment of liability in its favor based on the plaintiff's admitted violation of that non-disclosure provision. The court rejects the plaintiff's argument that the defendant is not entitled to judgment in its favor on this claim only because it has not established the existence of damages as a factual matter, for the same reasons as those discussed above. The defendant will have the opportunity at a trial to establish both the existence and amount of its purported damages. *Accord Conti v. Doe*, No. 17-CV-9268 (VEC), 2021 WL 1578047, at *16 (S.D.N.Y. Apr. 22, 2021) (denying defendant's motion for summary judgment on claim for breach of confidentiality agreement and finding that "questions of fact remain as to whether Doe suffered damages as a result of Dr. Conti's disclosures").

The Counterclaim also alleges that the plaintiff breached the confidentiality provision when its counsel "made public comments about the case in the media." (Counterclaim ¶ 77.) In support of this claim, the defendant cites an article that references the Complaint itself and quotes plaintiff's counsel as stating: "Every lawyer who has been admitted to the bar is expected and has the obligation to know and understand the ethical rules that govern one's practice, including under what circumstances, if at all, one can represent both parties in a transaction." https://www.law360.com/articles/1237996. The parties do not actually discuss this matter, but the court finds, as a matter of common sense, that the quoted comment by plaintiff's counsel, which is simply a statement of law and does not quote or reference any portion of the 2015 Agreement, cannot reasonably be construed as violating the confidentiality provision thereof. Thus, insofar as the defendant seeks summary judgment on Count IV based on the article quoting plaintiff's counsel's comment, that portion of the motion will be denied.

The defendant has established that it is entitled to partial summary judgment in its favor as to Count IV of the Counterclaims.

e)     *Count V: Claim for an Accounting*

The defendant asserts in Count V of the Counterclaims that it is entitled to an accounting as a matter of law, based on the unequivocal terms of the 2015 Agreement. It does not seek damages in association with Second Ave's failure to permit it to audit the Museum's books; rather, it states that it is "entitled to an accounting to help it determine the proper amount of damages" for the plaintiff's underpayment. (Doc. No. 76, at 40; *see also* Doc. No. 12, Counterclaim ¶ 84.) In response, Second Ave argues only that, once it resumes making payments, the claim for an accounting will be rendered moot. This argument is unavailing, as previously discussed. Further, even if the plaintiff had never ceased making payments under the 2015 Agreement, the Agreement entitles RDN to an annual audit of the Museum's records. (*See* Doc. No. 70-4 ¶ 3(c).)

The plaintiff's only other argument against the defendant's claim for an accounting is somewhat ambiguous. It is either arguing that the defendant has not claimed damages arising from breach of its entitlement to an accounting or that its motion should be denied as to this claim, because "RDN briefs in its memorandum that it is seeking summary judgment . . . on its accounting claim," but did not actually address the accounting claim in its MPSJ. (Doc. No. 114, at 17 n.5 (comparing Doc. No. 75 with Doc. No. 76, at 39–40).) Besides the fact that RDN seeks a *declaration* that it is entitled to an actual accounting rather than damages related to that failure, the fact that it did not include any specific argument relating to this claim in the motion itself, as opposed to the Memorandum in support thereof, is simply immaterial. This is particularly so given that the MPSJ does not purport to summarize all of the defendant's arguments, but it does state that the defendant requests summary judgment as to all of its counterclaims and "incorporates" by reference its "Memorandum in Support of its Motion for Partial Summary Judgment as grounds for this Motion." (Doc. No. 75, at 2.)

The defendant is clearly entitled to a declaration that, under the terms of the 2015

Agreement,

> All books of account and records of Museum relating to this [2015] Agreement shall be retained for at least five (5) years after the end of the fiscal year to which they pertain. During normal business hours and upon thirty (30) days' prior written notice, but not more than once per twelve (12)-month period, [RDN] and/or its duly authorized representative(s) shall have the right to examine, audit and copy such books of account, records and all other documents and material in Museum's possession or control with respect to this [2015] Agreement and to make summaries thereof. Provided, however, that such audits shall be undertaken at such times and in such manner as not to disrupt the normal operations of the Museum.

(Doc. No. 70-4 ¶ 3(c).)

### 2.    Claims in Second Ave's Complaint

#### a)    The 2015 Agreement

The Complaint, as indicated above, seeks a declaration that the 2015 Agreement is unconscionable and, therefore, unenforceable, and it also seeks to "rescind and/or reform" that agreement and "the repayment to Second Ave" of all unreasonable amounts paid to RDN by Second Ave under the 2015 Agreement. The defendant seeks summary judgment on the plaintiff's claims related to the 2015 Agreement on the grounds that the 2015 Agreement is not unconscionable or unenforceable as a matter of law.

The plaintiff does not address this argument except, obliquely, by continuing to assert in its factual summary that "Second Ave lack[ed] meaningful negotiating leverage" in the negotiations leading to the 2015 Agreement, "due to the already overreaching terms of the Original Agreement." (Doc. No. 114, at 6.) Only marginally more substantively, Second Ave argues that, assuming that the court grants its pending motion to voluntarily dismiss its affirmative claims, then "RDN's Motion is moot with respect to Second Ave's claims," including the claims related to the 2015 Agreement. (*Id.* at 11.)

The court construes the plaintiff's response as essentially incorporating its arguments in support of its Motion for Voluntary Dismissal, as they relate to the 2015 Agreement. The court

finds that, because the defendant has established that it is entitled to summary judgment in its favor on its claims for breach of the 2015 Agreement, as discussed above, and as discussed below in connection with the Motion for Voluntary Dismissal, RDN is also entitled to summary judgment in its favor as to the plaintiff's claims in the Complaint that the 2015 Agreement is unenforceable as a matter of law. The plaintiff's claim for a declaration that the payment provisions of the 2015 Agreement are unconscionable and unenforceable and its claim for rescission and reformation of that contract will be dismissed with prejudice. The court does not reach the defendant's other arguments in support of dismissal of these claims.

b)    *The Patsy Cline Museum*

In the Complaint, the plaintiff alleges as a factual matter that, in 2017, the Patsy Cline Museum opened on the second floor of the same building in which the Johnny Cash Museum is housed but that the two museums are separate corporate entities that do not share resources, revenue, financial accounts, or staff. (Doc. No. 1 ¶¶ 32, 33.) In 2019, RDN first asserted that it was entitled to the same percentages of gross revenues from the Patsy Cline Museum as from the Johnny Cash Museum. (*Id.* ¶ 43.) Second Ave seeks a declaration that RDN is not entitled to any revenues from the Patsy Cline Museum. (*Id.* Count II ¶¶ 55–56.)

In its Memorandum in support of the MPSJ, RDN states that the "only claims [it] makes in this action are for funds due" under the 2015 Agreement and that it has "made no independent claims for proceeds from the Patsy Cline Museum." (Doc. No. 76, at 34.) On this basis, it asserts that there is "no justiciable controversy" and that the plaintiff's claim for a declaratory judgment related to the proceeds from the Patsy Cline Museum should be dismissed. (*Id.*)

Although the plaintiff does not actually address this argument, in cases involving motions for summary judgment, a lack of response to the motion does not lessen the burden of the moving party to demonstrate the absence of a genuine issue of material fact, nor does the lack of response

lessen the court's burden "to examine the movant's motion . . . to ensure that he has discharged that burden." *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir. 1991). The court finds that the defendant has not satisfied its obligation to demonstrate the absence of a genuine issue of material fact. The Patsy Cline Museum is not referenced in the defendant's Statement of Undisputed Material Fact, and a mere statement in the defendant's Memorandum does not qualify as evidence. Although it is clear that this issue is not the focus of the parties' attention, the court finds that the defendant is not entitled to summary judgment in its favor as to the plaintiff's claim in Count II of the Complaint, seeking a declaration that the defendant is not entitled to any of the proceeds from the Patsy Cline Museum.

### c)    *The 2012 Agreement*

The defendant argues that the plaintiff's claims related to the 2012 Agreement are subject to dismissal on a wide variety of grounds. Specifically, RDN argues that (1) the claims are barred by the six-year statute of limitations that applies under Tennessee law to contract-related claims; (2) the claims are barred by the doctrine of laches; (3) the agreement was terminated, rendering "moot" any claims to rescind or invalidate the 2012 Agreement; (4) the plaintiff expressly waived claims related to the 2012 Agreement when it entered into the 2015 Agreement; and (5) the plaintiff is not entitled to rescission or damages, even if it could establish that the 2012 Agreement was unconscionable.[8]

---

[8] RDN also argues that any claims related to the purportedly improper joint representation by Liebmann are actionable only against Liebmann. While Second Ave indeed alleges, as a factual matter, that Liebmann had a conflict of interest and breached his fiduciary duty in purporting to represent both RDN and Second Ave in the formation of the 2012 Agreement, the Complaint is not attempting to bring a claim against Liebmann for breach of fiduciary duty. Rather, Second Ave simply posits this purported joint representation in support of its claim that it was without effective bargaining power, which led to grossly inequitable contract terms, as a result of which the 2012 Agreement is procedurally and substantively unconscionable.

While essentially conceding every fact set forth in the defendant's Statement of Undisputed Material Facts (*see* Doc. No. 115, *passim*), and despite not setting forth its own statement of material facts as to which it contends there is a material factual dispute, *see* Local Rule 56.01(c)(3), the plaintiff's Response memorandum lays out an alternative version of the history of the parties' dealings. As noted above (*see supra*, Note 5), Second Ave continues to insist that Liebmann improperly represented both parties jointly in the negotiations of the 2012 Agreement, without notifying Miller that this joint representation constituted a conflict of interest or obtaining a conflict waiver from him; that Miller "believed, reasonably, based on Liebmann's conduct and statements, as well as reassurances from Nueske, that Liebmann was acting in the interests of both parties"; and that the court should give "no preclusive effect" to the Magistrate Judge's determination, adduced within the narrow "context of an evidentiary ruling," that "there was insufficient evidence in the email communications of the parties to set aside RDN's attorney client privilege." (Doc. No. 114, at 3, 8.)

The court declines to take these factual allegations into consideration and also rejects the contention that the Magistrate Judge's ruling applies so narrowly. The Magistrate Judge did not err in denying the plaintiff's Motion to Compel—and even if he had erred, the plaintiff never sought review of that holding. Regardless, the court agrees with the Magistrate Judge that the record is absolutely devoid of evidence—aside from the plaintiff's subjective impression—that attorney Liebmann improperly represented both Miller/Second Ave and Nueske/RDN in the negotiation and formation of the 2012 Agreement.[9] Thus, the operative question is simply whether

---

[9] The court understands the plaintiff's unconscionability theory (or one of them) to be that, if Liebmann breached a fiduciary duty to Miller or Second Ave in the formation of the 2012 Agreement, then that agreement would be voidable at Second Ave's option, regardless of whether the agreement is actually unconscionable (as opposed to merely being more favorable to RDN than Second Ave would like). Of course, Second Ave has presented no legal support for this theory,

Second Ave can otherwise establish that the 2012 Agreement was unconscionable.

The defendant's motion does not squarely address the question of unconscionability, instead arguing that the claim is foreclosed altogether, irrespective of its merit.[10] Second Ave has made no effort to parry the defendant's collateral attacks, other than by arguing that RDN's motion will be mooted altogether if the court grants the plaintiff's Motion for Voluntary Dismissal. Second Ave, that is, has put all of its eggs in that basket. The plaintiff's failure to respond substantively to the defendant's arguments puts the court in a difficult position. The plaintiff has not clearly waived its objection to the dismissal of any of its claims on summary judgment, but its unresponsive response has done little to assist the court in resolving the defendant's motion.

*i. Statute of Limitations*

A six-year limitations period applies under Tennessee law to "[a]ctions on contracts" generally. Tenn. Code Ann. § 28-3-109(a)(3). The defendant argues that, because unconscionability is determined "at the time the contract is made" (Doc. No. 76, at 18 (quoting *Taylor v. Butler*, 142 S.W.3d 277, 285 (Tenn. 2004)), a cause of action to rescind a contract as unconscionable accrues as of the time the contract is formed (*id.* at 19). The defendant argues that, because the 2012 Agreement was formed in 2012, but the plaintiff did not file suit until January

---

and the court is not fully persuaded. Regardless, because Liebmann did not owe a fiduciary duty to Second Ave, this theory is without merit.

[10] The court, frankly, is perplexed as to why the defendant did not move for summary judgment on the ground that the 2012 Agreement is neither procedurally nor substantively unconscionable. Unconscionability, as discussed above, is a question of law for the court, and whether a contract is unconscionable is determined based on its actual terms, not on how they play out over time. *See Whitton v. Hoover*, 313 S.W.3d 262, 264 (Tenn. Ct. App. 2009) ("[T]he contract is examined in the context of time in which it was made."). The 2012 Agreement, on its face, does not appear to be "so one-sided that the contracting party is denied any opportunity for a meaningful choice." *Id.* at 265 (quoting *Haun v. King*, 690 S.W.2d 869 (Tenn. Ct. App. 1984)). However, because the defendant did not move for summary judgment on that ground, the plaintiff was not required to come forward with evidence or argument to support its claim of unconscionability.

2020, the claim is barred by the statute of limitations.

The court is not persuaded. Typically, unconscionability is raised as a defense to a breach of contract claim. It may be brought as a stand-alone claim for declaratory judgment, but usually it pertains to a contract that is still in operation and is raised as justification for a party's decision to stop complying with the terms of a contract or to stave off the other party's attempt to enforce a particular provision (such as an arbitration provision). In such situations as those, the fact that the contract was formed more than six years prior to the initiation of a lawsuit would not prevent a party seeking to avoid its obligations under a contract to raise unconscionability as a defense or as an affirmative claim, because the controversy accrues, not upon the formation of the contract, but at the time a party challenges its enforcement or enforceability.

Thus, for instance, in *Muzquiz v. Para Todos, Inc.*, 624 S.W.3d 263 (Tex. Ct. App. 2021), the court held that a 2016 lawsuit seeking a declaration that a 2003 contract was unenforceable was not barred by the state's four-year statute of limitations. In that case, the parties had entered into a lease in 2003 and continued operating under that lease until 2016, when the son of the original lessor inherited the property, subject to the lease, from his mother and brought suit against the lessee seeking a declaration of his rights under the lease, in particular that he had the right to terminate it even though the lease, by its terms, was perpetually renewable and terminable only by the lessee. In rejecting the lessee's statute of limitations defense, the Texas Court of Appeals first noted that the defendant, as the party raising the defense, had the burden of pleading and proving both the date on which the limitations period commenced—that is, the accrual date—and that suit was filed outside that time. *Id.* at 277. It then rejected the defendant's argument that a justiciable controversy arose when the lease was executed, which was based on "case law analyzing contract reformation claims based on mutual mistake." *Id.* at 278. The court stated:

> We find this is a somewhat unique situation where there is not an underlying "cause of action" upon which [the plaintiff] brought this lawsuit. . . . [T]he crux of the controversy in the declaratory judgment action was the Lease's unenforceability as written and/or [the question of the lessor's] rights under the explicit terms. The question of validity or construction did not arise until [the plaintiff/lessor] sought to terminate the lease and renegotiate it, which [the defendant] refused to do.

*Id.* Because the plaintiff sought a declaration that the lease as written rendered it either terminable at will or void, the court found that the request for a declaration "did not become a live controversy until [the plaintiff] attempted to terminate the lease," which occurred in 2015—twelve years after execution of the lease but well within the four-year limitation period. *Id.*

Similarly, in the present case, the question of unconscionability did not accrue in 2012, because there was no live controversy concerning the enforceability of the contract at that point. Instead, it likely accrued no earlier—and also no later—than June 2014, when Miller sent Nueske an email asking Nueske to "consider ending or altering the sponsorship agreement between the museum and RDN," based on how onerous its payment terms had turned out to be for Second Ave. (Doc. No. 70-11, at 2.) Ultimately, the parties were able to renegotiate the contract terms and enter into the 2015 Agreement, but that event did not necessarily obviate the plaintiff's ability to challenge the previous agreement based on unconscionability. The plaintiff filed suit in January 2020, less than six years after Miller's June 2014 email. In the absence of persuasive authority to support RDN's position, the court finds that the defendant has not established that the cause of action for a declaration as to the unconscionability of the 2012 Agreement accrued more than six years before the plaintiff brought suit.

### ii. "Mootness"

RDN also argues that any claim for a declaration that the 2012 Agreement was unconscionable was rendered moot by the termination of that contract. Although the defendant employs the term "moot," what it actually appears to mean is that the plaintiff's claim was rendered

non-justiciable before suit was ever filed and, consequently, that the plaintiff lacked standing to bring suit challenging the 2012 Agreement in the first place.[11]

Second Ave seeks a declaration under 28 U.S.C. § 2201 that the 2012 Agreement was unconscionable. A fundamental prerequisite for issuance of a declaratory judgment is that there be an "actual controversy" between the parties. *Id.* Because a party cannot seek an advisory declaratory judgment, the Sixth Circuit has recognized that an expired contract typically does not present an actual controversy justifying the issuance of a declaration. *Gen. Elec. Co. v. Local 761, Int'l. Union of Elec., Radio & Machine Workers*, 395 F.2d 891, 895 (6th Cir. 1968); *see also City of Parma v. Cingular Wireless, LLC*, 278 F. App'x 636, 641–42 (6th Cir. 2008) ("Parma seeks a declaratory judgment memorializing the parties' agreed-upon interpretation of the Agreement. In the absence of a real dispute, however, such relief would constitute an advisory opinion, forbidden under Article III of the Constitution.").

In *General Electric*, the parties were the signatories to a collective bargaining agreement and a supplemental agreement requiring the defendant unions to give notice before initiating a strike. The plaintiff filed suit seeking a declaration that the latter agreement was valid and binding and that the defendants' attempted rescission of the agreement was invalid. It was apparently uncontested that the defendants had also breached the agreement by striking without providing the

---

[11] The Supreme Court has frequently described the doctrine of mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). In *Friends of the Earth*, the Court recognized this formulation as too reductive, *see id.* at 190, but the formulation serves to illustrate the principle that mootness is something that happens after a lawsuit is filed, while standing is what a plaintiff must establish in order to bring a lawsuit at all. *See id.* at 191 ("Standing doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake. In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years.").

requisite notice, but the plaintiff did not sue for breach or for damages arising from the breach; it only sought a declaration that the agreement was binding. The district court granted the requested relief and entered judgment for the plaintiff. Shortly after the defendants' appeal was docketed, the collective bargaining agreement and the notice agreement both expired by their terms, as a result of which the appellants brought a motion to dismiss for mootness. The plaintiff responded that there was still "an actual controversy between the parties including an important right to money damages." *Gen. Elec. Co.*, 395 F.2d at 893. The court noted that this was General Electric's "first suggestion . . . that money damages were a consideration in its seeking of declaratory relief." *Id.* Largely because the plaintiff had not initially brought suit for breach of the agreement or damages (under 28 U.S.C. § 2202 or otherwise), the court concluded that the controversy before it, which sought only the construction of an expired contract, was no longer "live" in light of the expiration of that contract. Because the "'actual controversy' requisite to invoke the Declaratory Judgment Act" no longer existed, the court remanded the matter to the district court with instructions to vacate the judgment and dismiss the case. *Id.* at 895–96.

This court finds that the principle embodied in *General Electric* is not necessarily binding here, because the plaintiff does not seek *construction* of an expired contract, but a declaration that the contract was unconscionable from the outset, as a result of which it is entitled to rescind or reform the contract retroactively and to recuperate any unreasonable funds paid under the agreement. As a result, the case presented a justiciable controversy when it was filed, which has not been rendered moot by subsequent events.

*iii. Waiver*

RDN also argues that Second Ave's claim attacking the 2012 Agreement as unenforceable is "foreclosed," because Second Ave "expressly waived its claims under the Original Agreement

in the Amended and Restated Agreement." (Doc. No. 76, at 22.) This argument finds better traction.

The 2015 Agreement expressly provides that, in executing that agreement, RDN "release[d] any rights it may have under the [2012] Lease to purchase the building housing the Museum Premises under the [2012] Lease," and, in return, Second Ave agreed, first, to "release and hold [RDN] harmless" from any claims related to the [2012] Lease, which was, in any event, terminated when Miller (actually an "entity controlled by Miller") purchased the building in which the Museum was located in 2014. (*See* 2015 Agreement, Doc. No. 70-4, at 1, 5 ¶ 7.) In addition, and more critically, Second Ave also agreed to "release and hold [RDN] harmless from *any claim* against [RDN] . . . with respect to *operations of the Museum through the Termination Date*." (*Id.* at 5 ¶ 7 (emphasis added).) The "Termination Date" is not actually defined by the 2015 Agreement, but the subsequent paragraph makes it clear that the date refers to the termination of the 2012 Agreement. This paragraph provides that, upon Second Ave's payment to RDN of all sums owed under the 2012 Agreement for the last quarter of 2014,

> the provisions of the [2012] Agreement shall cease to be effective as between the Parties and the provisions of this New Agreement shall be substituted and govern the relationship between the Parties as of January 1, 2015 (i.e. this New Agreement shall have an effective date of January 1, 2015, such effective date contingent upon payment of Q4 2014 payment to [RDN] under the Original Agreement . . . .

(*Id.* ¶ 8.) That is, the "Termination Date" of the 2012 Agreement was January 1, 2015, which was also the effective date of the 2015 Agreement.

The court finds that, by entering into the 2015 Agreement that contained this language, Second Ave unambiguously waived its right to bring any claim against RDN related to the "operations of the Museum" that might have accrued through the January 1, 2015 Termination Date of the 2012 Agreement, which would necessarily include claims related to the calculation of Museum and gift shop revenues and the payment of compensation to RDN. While the plaintiff's

claim of unconscionability putatively relates to the terms of the contract rather than to the "operations of the Museum," what the plaintiff actually challenges as unconscionable are the payment terms of the 2012 Agreement, entitling RDN to 15% of the first $600,000 in annual gross revenue, 12% of the next $200,000 in annual gross revenue, and 10% of gross annual revenues in excess of $800,000. (Doc. No. 70-1, at 3 ¶ 2(F); *see also* Doc. No. 1 ¶¶ 53 & 60 (seeking a declaration that "the percentage provisions are unconscionable and unenforceable" and demanding "repayment to Second Ave Museum of all amounts that are unreasonable and excessive paid to [RDN] since April 2012").) By waiving "any claim" against RDN "with respect to" Museum operations, Second Ave waived its right to challenge its payments to RDN under the 2012 Agreement, as unconscionable or otherwise. On this basis alone, RDN is entitled to summary judgment in its favor on the plaintiff's claim for a declaration that the 2012 Agreement was unconscionable. The plaintiff waived this claim by executing the 2015 Agreement.

*iv. Laches*

In addition, the court also finds that, as the defendant argues, the plaintiff's claims related to the 2012 Agreement are barred by the doctrine of laches.

Laches is traditionally an equitable doctrine. *See* Eric Fetter, *Laches at Law in Tennessee*, 28 U. Mem. L. Rev. 211 (1997). And, "[u]nlike statutes of limitations, laches has no fixed period of time for barring a claim brought in equity. Thus, laches may be invoked in purely equitable actions to bar a claim prior to the running of the applicable statute of limitations . . . ." *Id.*; *accord Dennis Joslin Co., LLC v. Johnson*, 138 S.W.3d 197, 201 (Tenn. Ct. App. 2003).

The defense of laches is based on the doctrine of equitable estoppel, and it presents a mixed question of law and fact. *Brown v. Ogle*, 46 S.W.3d 721, 726 (Tenn. Ct. App. 2000). As a factual matter, the defense requires the showing of two factors: (1) "negligence and unexcused delay on

the part of the complainant in asserting his alleged claim" and (2) resulting "injury to the party pleading laches." *Id.* (citing *Sunderhaus v. Perel & Lowenstein*, 388 S.W.2d 140 (Tenn. 1965)); *see also Dennis Joslin*, 138 S.W.3d at 200 (laches requires "[1] an unreasonable delay that [2] prejudices the party seeking to employ laches as a defense, and it depends on the facts and circumstances of each individual case"). Once the requisite showing of these factors is made, the court then decides, as a matter of law, whether "it would be inequitable or unjust to the defendant to enforce the complainants' right." *Brown*, 46 S.W.3d at 726. "In the cases applying the defense of laches, the courts frequently cite the death of witnesses or the loss of evidence as the sort of prejudice that, coupled with an unreasonable delay, amount to laches." *Id.* at 726 (citations omitted); *see also Evans v. Steele*, 145 S.W. 162, 165 (Tenn. 1912) (noting that courts apply laches to bar relief "only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence").

The defendant argues here that the plaintiff was negligent in waiting until eight years after the execution of the 2012 Agreement before bringing suit claiming unconscionability, during which time it enjoyed all the benefits of the arrangement. RDN further points out that, instead of filing suit challenging the enforceability of the 2012 Agreement in 2014, Miller, on behalf of Second Ave, strategically chose to work with Nueske and Liebmann to renegotiate the terms of the original agreement. Robert Nueske died in 2015, and still the plaintiff did not bring suit. He waited another five years—long enough after the negotiations of both the 2012 Agreement and the 2015 Agreement that the recollections of the other individuals involved, particularly those of Frey, had substantially faded. As a result, the defendant argues, the plaintiff's unwarranted delay in

pursuing claims related to the 2012 Agreement has clearly prejudiced RDN in its ability to defend itself against the claims. (*See* Doc. No. 76, at 25.)

The court finds the defendant's position to be persuasive and that the facts necessary to permit the application of laches are present here: the plaintiff's negligent and unreasonable delay in bringing suit coupled with substantial prejudice to RDN, the party raising the defense, as a result of the delay. Second Ave was clearly negligent in waiting until 2020 to challenge the validity of an agreement that it entered into in 2012 and reformed in 2014. Miller has acknowledged that Nueske provided the necessary funding for his project when no bank would take on the risk. Second Ave benefited from Nueske's and RDN's financial support for the venture for years before seeking reformation of the parties' arrangement in 2014 and then chose to continue working with RDN for five more years before bringing this lawsuit. If Miller truly believed the 2012 Agreement was unconscionable from the outset, he could have filed suit on behalf of Second Ave to challenge it in 2014. Instead, rather than risking alienating Nueske or repudiating the relationship altogether, he chose, probably for strategic reasons, to move forward under the 2015 Agreement. At this late date, Nueske is no longer available to present his version of events leading to the 2012 Agreement or his reasons for agreeing to reform the agreement, and Frey admittedly has little recollection of what occurred during the 2014 negotiations leading to the 2015 Agreement.

Finding that the facts *permit* the application of the doctrine of laches, the court also finds, as a matter of law and in the exercise of its discretion, that it would be inequitable to RDN to permit the plaintiff to proceed with its unconscionability claim. *See Brown*, 46 S.W.3d at 726. The interplay of all of the circumstances in this case mandate the application of the doctrine of laches to bar the plaintiff's claim that the 2012 Agreement is unenforceable. In particular, by reforming the contract with RDN in 2014, the plaintiff effectively signaled its intent to continue to benefit

from the relationship between it and RDN. RDN made concessions in the 2015 Agreement that it was not obligated to make under the 2012 Agreement and that it likely would not have made if it had known that the plaintiff would seek to retroactively challenge and recoup payments made to RDN under the 2012 Agreement.

In sum, even though the claim is not technically non-justiciable or barred by the statute of limitations, Second Ave is barred by the doctrine of laches from pursuing a claim that the 2012 Agreement was unconscionable.

*v. No Available Remedy*

Finally, as the defendant points out, although the plaintiff articulates "Rescission and/or Reformation of the Contract" as a stand-alone "count" (Count III) in the Complaint, neither rescission nor reformation of contract is an actual claim or cause of action. *See Yaldu v. Bank of Am. Corp.*, 700 F. Supp. 2d 832, 847 (E.D. Mich. 2010) ("Rescission and reformation are not separate causes of action; rather, they are equitable remedies." (citing *Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 842 n 2 (6th Cir. 2007)). Because the plaintiff's claim of unconscionability of the 2012 Agreement is barred by both waiver and laches, Second Ave is not entitled to any remedy arising from that claim, and Count III is subject to dismissal on that ground alone.

Even if that were not the case, under Tennessee law, the remedy of rescission is "not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court," which discretion should be exercised "sparingly." *Vakil v. Idnani*, 748 S.W.2d 196, 199–200 (Tenn. Ct. App. 1987) (citing *Early v. Street*, 241 S.W.2d 531 (Tenn. 1951)). Moreover, as this court recently recognized, it is a "a fundamental rule in equity [that] a contract will not be rescinded if the parties cannot be placed in status quo." *Constr. Mgmt., Inc. v. Expo Hosp., LLC*, No. 3:19-

CV-00298, 2019 WL 2917991, at *6 (M.D. Tenn. July 8, 2019) (Trauger, J.) (quoting *Lindsey-Davis Co. v. Siskin*, 358 S.W.2d 331, 333 (Tenn. 1962)). "If the parties cannot be put in status quo, or if, due to the passage of time or other reasons, equity cannot be done, there is no ground for rescission." *Song v. Chung*, No. E2018-00114-COA-R3-CV, 2018 WL 5618114, at *10 (Tenn. Ct. App. Oct. 30, 2018) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993)).

Given the passage of time in this case and the number of events that have transpired since the parties first entered into a contractual relationship—the creation of the Johnny Cash Museum, the unexpected initial success of the Museum, the termination of the 2012 Lease and the plaintiff's purchase of the building in which the Museum is housed, the reformation of the 2012 Agreement and its replacement by the 2015 Agreement, Nueske's death, and an additional five years, following his death, of operating under the 2015 Agreement—it is simply not possible to return the parties to a place remotely approximating their pre-contracting status quo. Too much time has passed, and too much money has changed hands, some of it to the hands of third parties.

The plaintiff also seeks reformation, also an equitable remedy rather than a cause of action, "including the repayment to Second Ave Museum of all amounts that are unreasonable and excessive paid to [RDN] since April 2012." Reformation and repayment are not available either, for the reasons set forth above—namely Nueske's death and the fact that the parties already reformed the contract without actually rewinding the 2012 Agreement at a time when doing so would arguably still have been feasible.

Regardless, because the court finds that the claim that the 2012 Agreement is unconscionable is barred by waiver and by laches, Count III, for remedies premised upon the presumption that the agreement was unconscionable, must also be dismissed with prejudice.

### III.    MOTION FOR VOLUNTARY DISMISSAL

Citing Rule 41(a)(2) of the Federal Rules of Civil Procedure, the plaintiff seeks voluntary dismissal, without prejudice, of its claims for declaratory relief set forth in the Complaint. It claims that the economic effects of the COVID pandemic and the expense of litigation have prompted it to seek voluntary dismissal of its claims. It acknowledges that the decision of whether to grant such a motion lies within the court's discretion and argues that the court should exercise such discretion in its favor, as dismissal of its claims without prejudice would not cause the defendant to suffer "plain legal prejudice" arising simply from the "mere prospect of a second lawsuit." (Doc. No. 100, at 5 (quoting *Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994)).) In particular, the plaintiff asserts that dismissal of the affirmative claims in the Complaint would not affect the validity of, or the court's jurisdiction over, the defendant's Counterclaims. At the same time, as discussed above, the plaintiff argues, in a completely circular fashion, that the dismissal of its claims (coupled with its intent to resume payments to RDN) would moot the defendant's Counterclaims.

The defendant strenuously opposes the dismissal without prejudice of the claims in the Complaint, repeatedly and indignantly insisting that the Complaint was filed in bad faith, as also set forth in the defendant's Answer and affirmative defenses, and that the plaintiff "falsely blames the COVID pandemic" as its reason for now seeking dismissal, misstates the course of discovery in this case, ignores the fact that RDN had already filed its summary judgment motion several months prior to the filing of the plaintiff's Motion for Voluntary Dismissal, and ignores the effect of the denial of the plaintiff's Motion to Compel Discovery of RDN's privileged communications with its former legal counsel. (Doc. No. 108, at 1.) RDN maintains that dismissal without prejudice should be granted only on the condition that the plaintiff pay RDN's attorney's fees and costs incurred to date and requests that the court defer ruling on the Motion for Voluntary Dismissal

until after the filing of its then-anticipated Rule 11 Motion for Sanctions (which has now been filed). RDN further argues that dismissal without prejudice at this juncture would greatly prejudice it, given that the parties have litigated the case for eighteen months, during which the plaintiff engaged in tactics to delay and disrupt progression of the case, causing RDN to incur unnecessary expenses, and that dismissal without prejudice would "leave[] the door open for RDN to incur duplicate costs for the same litigation if the Plaintiff should choose to refile it, *unless* the Court awards RDN its costs and attorney's fees." (*Id.* at 12.) Alternatively, the defendant argues that the court should exercise its discretion under 28 U.S.C. § 1927 to impose sanctions against the plaintiff and its counsel, in what likely amounts to a preview of its Rule 11 motion. Finally, the defendant argues that, even if the court dismisses the plaintiff's claims *with* prejudice, it should award attorney's fees and order that the plaintiff's jury demand remain in effect, since the defendant relied on that demand and did not make its own jury demand.

The plaintiff's Reply (Doc. No. 113) points out that the defendant's opposition is based primarily upon its demand for attorney's fees and that its claim that the *plaintiff* has unnecessarily multiplied litigation costs is belied by the fact that the defendant's opposition to the dismissal motion is twenty-three pages long and accompanied by over five hundred pages of exhibits. Second Ave further insists that RDN has waived the right to demand a jury, that its attorney's fee demand is not ripe, and that there is "practically no risk of a second lawsuit" under the circumstances presented here. (Doc. No. 113, at 4.) The plaintiff insists that RDN, not Second Ave, has "forced the unnecessary expenditure of attorney time and fees in this case." (*Id.* at 6.) It denies acting in bad faith and has submitted the Declaration of counsel attesting to his good faith in filing this lawsuit. Predictably, the defendant sought, and was granted, permission to file a Surreply, which generally refutes the plaintiff's arguments and again insists that RDN will suffer

prejudice if the Complaint is dismissed without prejudice. (Doc. No. 121.)

Neither party spends much time addressing the actual legal standards that pertain to a motion for voluntary dismissal without prejudice that is filed when a motion for summary judgment is already pending. Rule 41 provides that, after the defendant has filed an answer or a motion for summary judgment, "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Fed. R. Civ. P. 41(a)(2). "Whether dismissal should be granted under the authority of Rule 41(a)(2) is within the sound discretion of the district court." *Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994) (citing *Banque de Depots v. Nat'l Bank of Detroit*, 491 F.2d 753, 757 (6th Cir. 1974)). "An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Rosenthal v. Bridgestone/Firestone, Inc.*, 217 F. App'x 498, 500 (6th Cir. 2007) (quoting *Geier v. Sundquist*, 372 F.3d 784, 789–90 (6th Cir. 2004)). A court abuses its discretion in this context "only where the defendant would suffer 'plain legal prejudice' as a result of a dismissal without prejudice, as opposed to facing the mere prospect of a second lawsuit." *Grover*, 33 F.3d at 718 (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 2179 (1947); *Kovalic v. DEC Int'l, Inc.*, 855 F.2d 471, 473 (7th Cir. 1988)).

"Courts readily find plain legal prejudice where dismissal results in stripping a defendant of an absolute defense." *Rosenthal*, 217 F. App'x at 500. Thus, for example, "[a]t the point when the law clearly dictates a result for the defendant, it is unfair to subject him to continued exposure to potential liability by dismissing the case without prejudice." *Id.* (quoting *Grover*, 33 F.3d at 719, and citing *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984) ("If defendant has already won its case, reimbursement of fees and expenses cannot make it whole from the injury of

being sued again, perhaps this time to lose.")). On the other hand, the mere "the existence of a pending motion for summary judgment," while a factor to be considered, "does not mandate a finding of plain legal prejudice." *Id.* at 502.

The defendant is so focused on its quest for attorney's fees that it utterly fails to substantively address the question of prejudice. The court nonetheless finds that the plaintiff effectively abandoned the claim of unconscionability, insofar as it is directed to the 2015 Agreement, when, in responding to the defendant's MPSJ, the plaintiff conceded liability for payments due under the 2015 Agreement and failed to object to the validity of the contract. Further, the court has found, as set forth above, that RDN is entitled to summary judgment on its claims for breach of the payment and other provisions of the 2015 Agreement, leaving only the question of damages for trial. Judgment in favor of the defendant on the breach of contract claims (which requires, as the first element, the existence of a valid contract, *see ARC LifeMed*, 183 S.W.3d at 26) necessarily has a preclusive effect on the plaintiff's ability to obtain judgment in its favor on the mirror-image claim that the same contract is invalid under Tennessee law. *See Massengill v. Scott*, 738 S.W.2d 629, 631 (Tenn. 1987) (holding that the doctrine of issue preclusion bars the same parties or their privies from relitigating in a second suit issues that were actually raised and determined in an earlier suit). Because "the law clearly dictates a result for the defendant" as to the plaintiff's liability for breach of the 2015 Agreement, *Rosenthal*, 217 F. App'x at 500, the plaintiff's claim for a declaration that the 2015 Agreement is unenforceable must be dismissed *with* prejudice, not without.

Likewise, the court has found that the plaintiff is affirmatively barred by waiver and the doctrine of laches from pursuing its claim that the 2012 Agreement is unconscionable and that it is simply too late in the game to seek rescission or (further) reformation of that contract. With

respect to these claims, too, "the law clearly dictates a result" in favor of RDN. *Id.* Consequently, the plaintiff's claim that the 2012 Agreement is unconscionable and its claim for remedies including rescission and reformation arising from such unconscionability must likewise be dismissed with prejudice.

The Motion for Voluntary Dismissal without prejudice, therefore, will be denied as to Counts I and III of the Complaint. However, as also set forth above, the defendant has not established that it is entitled to summary judgment on Count II of the Complaint, which seeks a declaration that the defendant is not entitled to any proceeds from the Patsy Cline Museum. The court will grant the plaintiff's motion to voluntarily dismiss that claim without prejudice.

Having denied in large part—and the only part that the parties have actually litigated—the plaintiff's Motion for Voluntary Dismissal, the court declines to address the defendant's arguments regarding whether it has preserved its right to a jury trial on its Counterclaims or as to whether it is entitled to attorney's fees.

## IV.    CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the defendant's MPSJ and grant in part and deny in part the plaintiff's Motion for Voluntary Dismissal. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge